UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Asheville Division)

```
----------------------------x
UNITED STATES OF AMERICA,   :
           Plaintiff        :
                            :
                            :
vs                          :Criminal Action:1:11-CR-086
                            :
ROBERT CRAIG GOURLAY,       :
            Defendant.      :
----------------------------x
```

Tuesday, November 26, 2013
Asheville, North Carolina

The above-entitled action came on for a Sentencing Hearing Proceeding before the HONORABLE MARTIN K. REIDINGER, United States District Judge, in Courtroom 1 commencing at 2:19 p.m.

**APPEARANCES**:
On behalf of the Government:
DON GAST, Esquire
Office of the United States Attorney
100 Otis Street
Asheville, North Carolina 28801

On behalf of the Defendant:
DAVID B. FREEDMAN, Esquire
Crumper Freedman Parker & Witt
301 N. Main Street, Suite 1100
Winston-Salem, North Carolina 27101

Tracy Rae Dunlap, RMR, CRR 828.771.7217
Official Court Reporter

**I N D E X**

Page

Reporter's Certificate......................41

**P R O C E E D I N G S**

THE COURT: Good afternoon, everyone.

MR. FREEDMAN: Good afternoon.

MR. GAST: Good afternoon, Your Honor.

THE COURT: The first matter this afternoon is one that was held over from this morning, the case of United States versus Robert Craig Gourlay, and which is before the Court for the sentencing of the defendant pursuant to his plea of guilty on the charges of misapplication by a bank officer, and aiding and abetting the same, in violation of 18 U.S.C., Sections 656 and Section 2; and money laundering and aiding and abetting the same in violation of 18 U.S.C., Section 1957 and Section 2.

Mr. Freedman, good afternoon.

MR. FREEDMAN: Good afternoon, Your Honor.

THE COURT: Is the defendant prepared to proceed?

MR. FREEDMAN: He is, Your Honor.

THE COURT: Mr. Gast, good afternoon to you. Is the government prepared to proceed?

MR. GAST: Good afternoon, Your Honor. Yes, we're ready.

THE COURT: In preparation for this hearing I have reviewed the defendant's objections to the presentence report. I have reviewed the defendant's sentencing memorandum and a multitude of letters in support of the

defendant. I have also read the government's motion for a downward departure. Are there any other items that have been submitted in anticipation of this hearing? Any for the defendant?

MR. FREEDMAN: No, Your Honor. And I did wish to address the objection. At this time, we would be withdrawing that objection.

THE COURT: Okay.

MR. FREEDMAN: But, no, Your Honor, nothing else in terms of what's been filed so far.

THE COURT: Very good. Mr. Gast, has anything else been filed by the government in anticipation of this hearing?

MR. GAST: No, sir, Your Honor.

THE COURT: Mr. Gourlay, I need for you to stand, please. Do you recall appearing before the magistrate judge on or about the 1st of November of 2011 for the purpose of entering a plea of guilty in this case?

THE DEFENDANT: Yes, sir.

THE COURT: Do you remember being sworn in or placed under oath at that time?

THE DEFENDANT: Yes, sir.

THE COURT: Do you remember answering the questions of the magistrate judge?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Is it correct that, at that time, you signed a Plea Inquiry Form indicating that your answers were true and correct at the time they were given?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Were your answers, in fact, true and correct when you answered the questions of the magistrate judge?

THE DEFENDANT: Yes, Your Honor.

THE COURT: If I asked you all the same questions here today, would your answers be the same?

THE DEFENDANT: Yes, sir.

THE COURT: Mr. Freedman, were you in attendance at the Rule 11 hearing for your client?

MR. FREEDMAN: Yes, I was, Your Honor.

THE COURT: Are you satisfied that your client fully understood the questions that were asked of him by the magistrate judge at that hearing?

MR. FREEDMAN: Yes, Your Honor.

THE COURT: Are you satisfied that he has fully understood the questions that I've asked him here today?

MR. FREEDMAN: Yes, Your Honor.

THE COURT: Mr. Gourlay, did you answer those questions the way that you did and are you pleading guilty because you did, in fact, commit the crime with which you are charged?

THE DEFENDANT: Yes, Your Honor.
THE COURT: Is your plea of guilty the result of any threat or force or promise, other than promises that may be set out in your plea agreement?
THE DEFENDANT: No, sir.
THE COURT: Are you pleading guilty voluntarily?
THE DEFENDANT: Yes, sir.
THE COURT: In this case, you're pleading guilty pursuant to a plea agreement. In that plea agreement you have agreed, and the government has agreed, to certain facts and certain factors for sentencing. Under the law, I am not required to accept those facts or factors simply because both sides have agreed. And if I decline to accept any of those facts or factors in my sentencing decision, you will not have the right to withdraw your plea. Do you understand that?
THE DEFENDANT: Yes, sir.
THE COURT: Is it still your plea to plead guilty in this matter?
THE DEFENDANT: Yes.
THE COURT: Based upon the representations made to the Court and the answers given by the defendant at the Rule 11 hearing before the magistrate judge, the Court finds, concludes and confirms that the defendant's plea is knowingly and voluntarily made and that the defendant

understands the charges, potential penalties and consequences of his plea.

Mr. Freedman, does the defendant stipulate that there is a factual basis to support his plea of guilty entered in this case and, further, that the Court may accept the evidence as set forth in the presentence report as establishing such factual basis?

MR. FREEDMAN: Yes, Your Honor.

THE COURT: Mr. Gast, does the government so stipulate?

MR. GAST: Yes, Your Honor.

THE COURT: Based on the stipulation of the parties and the evidence as set forth in the presentence report, which report was previously reviewed by the Court, and based upon the defendant's admission of guilt, the Court finds, concludes and confirms that there is a factual basis for the defendant's plea. Accordingly, the Court confirms the magistrate judge's acceptance of the defendant's guilty plea and this court accepts the defendant's plea of guilty, finds the defendant is guilty and enters, thereon, a verdict and judgment of guilty.

Mr. Gourlay, there is a document that has been prepared; I'm holding up a copy of it here. I see that your attorney is showing you a copy there at your table. In the upper left-hand side it has a caption that reads,

"United States of America versus Robert Craig Gourlay." On the upper right-hand side it has a title that reads, "Presentence Investigation Report." Have you seen this document before today?

THE DEFENDANT: Yes, sir.

THE COURT: Have you had an opportunity to review it with your attorney?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand the contents of that document?

THE DEFENDANT: I do, sir.

THE COURT: Mr. Freedman, have you had an opportunity to review the presentence report with Mr. Gourlay?

MR. FREEDMAN: Yes, I have, Your Honor.

THE COURT: Are you satisfied that Mr. Gourlay understands the contents of that document?

MR. FREEDMAN: Yes, I do, Your Honor.

THE COURT: Thank you. Mr. Gourlay, you may take your seat. With regard to the presentence report.

Mr. Freedman, I understand that you have withdrawn your objections to the presentence report. Is that correct?

MR. FREEDMAN: That's correct, Your Honor.

THE COURT: Therefore, is there anything regarding

the presentence report that needs to be addressed?

MR. FREEDMAN: No, Your Honor.

THE COURT: Mr. Gast, anything for the government that needs to be addressed regarding the presentence report?

MR. GAST: No, Your Honor.

THE COURT: With that, then, the Court will accept the presentence report as written. Based thereon, the Court will find that the total offense level in this case is 25 and the criminal history category in this case is one. Based on that total offense level and criminal history category the Court will conclude, as a matter of law, that the guideline range applicable in this matter is a term of 57 to 71 months' imprisonment.

Mr. Freedman, did I calculate all of that correctly?

MR. FREEDMAN: Yes, Your Honor.

THE COURT: Do you agree, Mr. Gast?

MR. GAST: Yes, Your Honor.

THE COURT: The next thing I want to address is the government's motion for a downward departure. Mr. Gast, I have read your motion. Is there anything that you want to say in court, in addition to what -- in addition to what you have provided in writing as part of your motion?

MR. GAST: No, sir, Your Honor.

THE COURT: Okay. I have reviewed the motion for downward departure. Based on the statements that are set forth in that motion, as well as from my having presided over the trial of the case of United States versus Keith Vinson and having heard the defendant's testimony in that case, I will find that the defendant in this matter, Mr. Gourlay, has provided substantial assistance in this investigation and prosecution of others, and that the nature and the extent of that assistance is such as to warrant a downward departure, that departure being the equivalent of four offense levels. Therefore, the Court will sentence in this matter with reference to a total offense level of 21, rather than 25 as found and, therefore, will sentence with reference to an equivalent guideline range of 37 to 46 months' imprisonment.

Mr. Freedman, did I calculate the effect of a four level departure accurately?

MR. FREEDMAN: Yes, Your Honor.

THE COURT: Do you agree, Mr. Gast?

MR. GAST: Yes, sir, Your Honor.

THE COURT: Mr. Freedman, you had mentioned before we got started that there may be some individuals who you, even though we -- I received a number, and I'd say a fairly high number, of support letters with regard

to Mr. Gourlay -- but that you had a couple of people whom you wanted to have address the Court in some manner?

MR. FREEDMAN: Your Honor, I thought I'd discussed what their testimony would be this morning and I'd be in a position to proffer what they would have to say, and they're present in court. First of all, Your Honor, I believe the entire left-hand side -- my left-hand side, your right-hand side, of the courtroom is filled with supporters of Mr. Gourlay who have been here since approximately 11:00 this morning. There were some more people, in addition to that, who had to go -- they had child obligations after lunch or whatnot. But he -- as you can tell from the letters and from the support in the courtroom, he has extremely strong community support, and I'll address that in a second.

The three people who were going to address the Court this morning was a Margerie Mann, who is present in court, a local attorney who has known Mr. Gourlay for a very long -- significant period of time -- and has been on soccer trips with children and, basically, would address the Court about what a strong family man Mr. Gourlay is. He is raising five children, as we speak, three natural, two stepchildren, although he does not differentiate in terms of how he raises those children. But it's just that everything he does, he does

for them, I believe, to sort of summarize what her testimony would be. I believe you get the gist of that from the letters, as well.

THE COURT: Very much so.

MR. FREEDMAN: There is an A.C. Honeycutt who is a former employer, both at High Street Bank and First Citizens Bank who told me -- I believe he told me he had interviewed and employed up to 2,500 people throughout his career. And, in terms of character and trustworthiness, he would place Mr. Gourlay at the very top. And he just, again, thinks enough of him that he's present in court, and he was going to get up before this court and speak on his behalf.

One thing -- one particular situation he pointed out to me was, as Mr. Gourlay was leaving First Citizens to go to the Pisgah bank, Mr. Gourlay received a bonus of, I believe, three or $4,000. Mr. Gourlay could have taken it with him. But because Mr. Gourlay was leaving the bank, he decided to return the money to Mr. Honeycutt and said to distribute that amongst the employees who are going to stay. No one would have thought less of Mr. Gourlay had he taken that money, but Mr. Gourlay would have. And that's -- I believe that speaks well to his character as well.

And then Vivian Blue, who's known him most of his

life. And the most distinctive thing about her -- and I don't know that I've been able to present this in other matters -- is that she is his ex-mother-in-law who still sees him on a regular basis and thinks the world of him. She sees how he has continued to stay in touch with her and raise the children. Despite the fact that he's, you know, no longer married to her daughter, he stays very loyal. Specific instances she wanted to point out was that his father became disabled at a very early age. Craig spent a great deal of time taking care of his father while he was still in high school and, I believe, in junior high school as well, again, emphasizing the strength in family that Mr. Gourlay feels even at a very young age and taking on that sort of responsibility at an extremely young age.

In 1989 Ms. Blue's husband passed away at a very early age and, I believe, Craig was 20 years old or somewhere in that regard at that point. She remembers he wrote her a beautiful 2-page poem about dealing with loss and spirituality and how to deal with that. The amount of maturity, she said, he showed in that far exceeded his age at that time and helped her through an extremely difficult period. She specifically remembers another instance in 1993 when she worked for the hospital and there was a horrible blizzard. The hospital doesn't

excuse people for blizzards. I believe Craig got up at 3:00 in the morning or so and brought her in to work. Again, she thinks enough of him to this day to come before all these people and say these things on his behalf.

Your Honor, I think you get -- I believe you get a fairly good impression of Mr.- -- you probably got the best impression of Mr. Gourlay when he testified before you in a very forthright and honest manner. He took responsibility for what he did. He didn't try and slide it off on other people. That's what he's done since day one when he first came to see me. I believe it was in the summer of 2011 when he first approached me with this matter, and we addressed issues with him.

We didn't know what everyone else was going to do in this case. We didn't know -- at this point, I know Mr. Durham was a target and Mr. Cashion and Mr. Vinson and Mr. Chapman. But Craig, at that point, told me he wanted to come forth. He knew this had been over his head for the past two years, and he wanted to come forth and be honest about what had gone on.

And we had -- back in 2011 we had a number of meetings -- at least, I believe, two meetings with the IRS agent who is seated here in court today and Mr. Ellis, at that point, where Mr. Gourlay laid it all

out for them at that point. And though the others did not come on board until very recently and tried to question Mr. Gourlay's credibility, throughout that three-year period of time the government found Mr. Gourlay to be very honest, very forthright. As a result of his being out there on his own for two to three years -- and when I say "out there on his own," I mean the others were all going to go to trial and Mr. Gourlay is the only one who sort of has made this decision along the way.

The others eventually came in the fold, including, you know, most importantly, Mr. Durham, who Mr. Gourlay had a lot of information on. I don't know how much the Court heard before that but, you know, Mr. Durham was the boss of Mr. Gourlay. Mr. Durham had tried repeatedly to say he didn't know what Mr. Gourlay was doing and tried to absolve himself of his responsibility. And Mr. Gourlay was quite adamant that he didn't do anything without Mr. Durham's approval because he worked for him. Eventually, that proved to be the case and he was able to show that and, also, bring in Mr. Chapman and Mr. Cashion. And he testified, I believe, quite honestly and, I believe, the government feels the same way for Mr. Vinson.

I say all that not just in terms of what he's --

what the Court could consider for 5(k) but in terms of the nature and characteristics of Mr. Gourlay. I believe everything about Mr. Gourlay, except for the time he worked for Pisgah and found himself in a most unfortunate situation where he made very bad choices. He acknowledged those bad choices three years ago and I think he's going to acknowledge them today. He wasn't receiving any extra money for his choices. He was trying to keep -- I'm sure there's always self-interest in trying to keep your job alive and your bank afloat.

Unlike other witnesses who -- or other people who have come before this court, he was taking nothing, no kickbacks. He was taking no money. He made some bad choices and he put the bank in jeopardy as a result of that. I think all his actions, both before and since, shows he's not a selfish human being. He thinks about others first and foremost.

He's gone to Blue Ridge community College where he's received an associate's degree in auto collision. And he's prepared -- whenever he's in a position to do so, he's prepared to engage in a vocation in that direction so he can support his family. Again, as you can see from the letters and whatnot, that is first and foremost for him.

As a result of his actions, he's lost this job.

He had been trained as a real estate appraiser; when the criminal investigation started, he lost that job as well. He's gone into bankruptcy. He's gone through public humiliation brought on by himself. Still yet, he has remained in this area and held his head up high. These people know who he is and that's why they're here. They know the truth, the true Craig Gourlay.

Your Honor, I would contend he's entitled to a significant variance. He actually had a plea -- because we had it early on, he pled to the most serious -- more serious charges than the people he was testifying against. It doesn't really affect his guidelines, with the exception of a one level increase for the money laundering, but I just want to point that out to the Court.

He has -- he's been gainfully employed his whole life. He's supported his family his whole life. Regardless of whether the Court gave him an active sentence or not, I believe his actions and what people have seen him go through are a very strong deterrence for others to avoid being involved in situations like Mr. Gourlay. And I believe it's been a great -- even though it has brought a stain upon the banking community, I understand that it's also been a great lesson the government has brought about to show other bankers that

such behavior, when you're trying to cut corners or bring in straw purchasers, will not be tolerated and the government will bring that about. And regardless of what the Court does today, I believe that message has been sent extremely strongly.

What Mr. Gourlay is mostly concerned about is being able to be in a position to continue to support his children. He has done so his whole life. He wishes to be with them now. I would contend, whether the Court decided not to give an active sentence, or a relatively small active sentence, so that he can be out and continue on the path he's been under the past three years or, actually, the past four years, since 2009, but certainly the past three years since he's -- since he's been cooperative with the government and been attentive to the government every stretch of the way and he can continue on that path. Unless the Court has any questions, specifically, I believe that would be it.

THE COURT: Okay. Thank you.

MR. FREEDMAN: Thank you, Your Honor.

THE COURT: Mr. Gast, what is the position of the government with regard to sentencing?

MR. GAST: Your Honor, the government believes that a 37-month sentence would be appropriate. That is the bottom of the range, as modified by the 5(k) motion

filed by the government in this case. And the bottom of the range, both because we think that's fair and, also, pursuant to the plea agreement, we agreed to recommend the bottom of the range as modified. We believe that's a fair and adequate judgment in this case. Defense counsel has done a very good job speaking well for Mr. Gourlay. And I will say -- and we've actually said this to Mr. Gourlay during trial prep. We, the government, don't judge people on the basis of their character. We judge their actions and act accordingly.

So, I certainly don't have cause or evidence upon which to dispute what Mr. Freedman asserted to the Court about the general good character of Mr. Gourlay, but what I have is a series of transactions. Those series of transactions were all fraudulent and they caused a collapse of the bank and the loss of, in excess, $9 million. They lost more money than the bank was even capitalized for. The Court heard this evidence.

Of course, the lot loan program alone was just shy of $4 million. Your Honor heard a lot of evidence about the first six loans and about how those loans are originally conceived as being the batch loan. And then Mr. Cashion and Mr. Gourlay, in consultation with each other, and Mr. Smith and Mr. Durham, came up with the idea of breaking it up into lot loans and, by doing so,

deceiving the board and breaking with the FDIC requirements of loans to one borrower. They broke up those first six loans and that's how they raised the first almost $2.7 million. When that didn't work, we remember the testimony of Mr. Cashion and the bucket with the hole in it. They needed more money. That's when Mr. Rantzos came in with three loans totaling roughly $7 million -- $700,000, plus the Dion loan for another $600,000. So that lot loan program, in total, was in excess of $3.9 million.

The Court heard evidence about the Ed Worlund loan that was secured by the annuity pledged by hypothecation by Mr. Dowling. Mr. Gourlay testified about that and how everyone knew that was a loan to the benefit of Mr. Vinson. And that, too, was fraudulent, and that was a $650,000 loss.

We heard testimony about one of the Betty Zieger loans for $50,000. We didn't go into the other one that's alleged in the Bill of Indictment and the facts for that are set forth in the PSR, as well. There was also a $450,000 loan. We excised that from the trial, and it was in the second superseding Bill of Indictment. But as we got on the eve of preparing for trial, we realized that, really, Mr. Vinson didn't have much to do with that. We would describe that, really, more between

the Pisgah Community Bank and Mr. Cashion. So while we did not talk about that at trial, there was evidence -- and it's set forth in the PSR, I believe, and also in the indictment -- that there was an additional $450,000 straw loan to Betty Zieger, Mr. Cashion's mother. That, too, was money that was intended for Mr. Vinson.

There was the Joan Cashion loan of originally $400,000 and then it became an $850,000 loan. That, too, was a loan to one borrower violation because they'd already tapped out Mr. Cashion's credit. And they made that to Mrs. Cashion knowing that that was in violation of FDIC regulations and knowing that it was a straw within a straw because, in fact, that money, too, was destined for Mr. Vinson and Seven Falls. So, you know, that's another $2 million just for those.

We didn't talk about the quid pro quo loans, that section of the superseding Bill of Indictment, because that was really a deal between Mr. Cashion and Mr. Chapman on behalf of their entities and Pisgah Community Bank. It really didn't deal as much with Mr. Vinson and so we didn't go into that at trial. But even that, Mr. Gourlay was very cooperative with us.

I mean, certainly, he was honest and forthright about how all that went down, but they loaned Buck Cashion $1.1 million in order to remove another debt off

of Pisgah Community Bank's books, that being the Jarco loan. And in order to incentivize Mr. Cashion from taking on that home that he did not want to buy, the bank had previously said no to the impact deal. We heard a little bit of testimony about the impact deal from Mr. Cashion. But that "no" became a "yes" when they needed to take that Jarco loan off the books.

They then loaned another $1.1 million to Ray Chapman, again ignoring the aggregation loan rules of loans to one borrower and things like. They loaned $360,000 and $825,000 to Collier Market Holdings and Somily Market Holdings, respectively. So that quid pro quo alone -- and that's set forth in paragraphs 30 through 34 of the PSR -- that's another $3.4 million.

Paragraph 85 of the PSR talks about the impact of the plea agreement in this case. And in paragraph 85 they talk about how there would have been an additional $4.6 million of loss. While we agree that it's at least that much, it actually omits the other Betty Zeiger loans, it omits the Joan Cashion loans, and it also omits the rest of the lot loan program. We agree, however, that we should probably omit the lot loan program loans from the calculation of his guidelines because, under 1B1.8, at the time Mr. Gourlay pled, we were really regarding Pisgah Community Bank. And I say "we"

collectively meaning the government: It was Mr. Ellis at the time.

We were regarding the lot loan program as a -- we were regarding Pisgah Community Bank, rather, as a victim of the lot loan program, and we were viewing that as Mr. Cashion and Mr. Vinson inflicting that upon Pisgah Community Bank. It actually wasn't until trial preparation, when Mr. Cashion came in and agreed to cooperate and testify for the government and also Mr. Gourlay, because he testified honestly, that they informed us that, actually, the Pisgah Community Bank, through the bank officers, went into the lot loan program knowingly. Your Honor heard testimony, both from Mr. Cashion and Mr. Gourlay, about that.

So, although that series of bad decisions cost the bank an additional $3.9 million in loss, we agree that under 1B1.8, because it only came to light because of his cooperation, that that should not be attributed to him. That's a very long and complex explanation to say that, although we believe that paragraph 85 actually understates the amount of loss -- it certainly does understate the amount of loss -- we agree that the amount of loss, but for the plea agreement and the cooperation, would render the guidelines as calculated by the probation officer. It's a little short because it fails

to include certain things. But that range in the guidelines is between $2.5 and $7 million, and we agree that it falls somewhere in there.

Looking at that, therefore, his guideline range, without the benefit of the plea agreement, would be 87 to 108 months. So he got the benefit, of course, of capping his loss amount by coming in early, just like Mr. Smith and Mr. Greenwood did. And, also, he then got the benefit of the 5(k). And so when the Court looks at, you know, the 5(k) recommendation of 37 months and looks at where the bottom of his guideline range would be without the plea agreement, that being 87 months, that's roughly half which, again, is roughly where the government likes to be when we have full and complete cooperation in the form of testimony from a defendant.

I'm going into a little more detail because I feel it's important to talk about some of the things that occurred at Pisgah Community Bank because there was an intentional effort during the trial of Mr. Vinson to excise a lot of that stuff regarding Pisgah Community Bank, specifically because it was not as pertinent to Mr. Vinson's standing by himself. Everyone -- the people that were most involved in the quid pro quo series of loans were Mr. Cashion, Mr. Chapman, Mr. Gourlay and Mr. Smith and Mr. Durham. We didn't talk a lot

about that and, therefore, the Court didn't hear a lot about that. However, it is set forth in the PSR. I say that now because there's no doubt the Court will consider relative culpability and try to square those.

Of course, there were separate conspiracies charged in the Bill of Indictment. Because even though they had common conspiracies to Mr. Vinson, Mr. Cashion, Mr. Chapman, Mr. Hager that, really, the conspiracy at one bank and the conspiracy at the other bank were different. Mr. Greenwood and Mr. Durham really didn't deal with each other, and neither did Mr. Greenwood and Mr. Gourlay. So, really, Mr. Greenwood, over here, was doing damage to his bank. And then at Pisgah Community Bank, it was really a combination, unlike at Bank of Asheville or -- I believe the evidence shows it was really Mr. Greenwood, more or less, in isolation.

At Pisgah Community Bank, really, it was a combined effort of Mr. Durham, Mr. Gourlay and Mr. Smith. I feel I was negligent in the first hearing of not describing more of Mr. Smith's involvement because we excised large portions of that trial because so much of that dealt with Mr. Cashion and not Mr. Vinson.

It was Mr. Cashion collecting that money, but the quid pro quo money was an effort to realign Buck Cashion's debt so that Buck Cashion could, in turn, take

on that Jarco debt to the benefit of the bank, not really to Mr. Vinson. And then as the part of the -- that was the "quid." The "quo" was that the bank would then loan Mr. Chapman $1.1 million and shift other debts that were already in Mr. Cashion's name to Collier Market Holdings and to "Somily," that's Mr. Dimitris's wife and Mr. Collier's wife, who -- at the time, neither of whom were employed. They were housewives and did not have their own independent means of income. All that is set forth in the superseding Bill of Indictment, so I'm sure the Court's familiar with all that. But because we didn't talk about it much at trial, I thought it bore repeating here.

In terms of squaring it with Mr. Greenwood's sentence. Again I would make the same argument I made before which is that it's difficult to do that. To some extent it's apples and oranges. They were different conspiracies and they are similar in the fact they both came in early. And as a result of coming in early, that is Mr. Greenwood and Mr. Gourlay, they both got very beneficial plea agreements because their loss amounts were capped because there were things we did not know at the time.

The things that we did not know about Mr. Greenwood were much more extensive at the time than

what we -- we actually had a pretty good handle on what had occurred at Pisgah. What we were missing at Pisgah was the understanding that, actually, Mr. Gourlay and Mr. Durham and Mr. Smith went along with the lot loan program, that they were actually part of the planning of that, and that was actually thanks to Mr. Gourlay. That's why I don't want the Court to hold him attributable to that amount under 1B1.8. But it bears noting there is a large section of loss that we did not talk about at the Vinson trial that, nevertheless, these folks are attributable for.

So I would submit that Mr. Gourlay and Mr. Durham are very similarly situated to Mr. Greenwood. They were -- they did the same thing that Mr. Greenwood did, only at their bank. The loss amounts in fact are different because Bank of Asheville was a much larger bank and there were more loans there. And other than that, any disparity between them might be warranted because, again, it's just a function of we knew less about Mr. Greenwood at the time we took his plea because he took advantage of that ignorance to plead when he did. And that's -- that's what every good defendant should do. Again, I'm not criticizing him for that but he came in at a time that was very beneficial to him; and Mr. Gourlay and Mr. Smith a little bit less so in their relative

positions.

As far as the relative culpability between Mr. Gourlay and Mr. Smith. I would submit that they are fairly comparable because Mr. Smith wrote up these documents and Mr. Gourlay approved them and Mr. Gourlay took them to Mr. Durham. It was really a combined effort of all three of them. Now, with that said, I cannot endorse, though, a nine month sentence, because the government has noted it disagrees with that as the appropriate sentence for Mr. Smith.

Mr. Smith's role was much greater and, I would submit, on par with Mr. Gourlay's and to a lesser extent Mr. Durham's. But what differentiates those three, in the government's view, is not the conduct but it's the relative titles. We have the president of the bank and that should have been, you know, the buck stops there. Then you have Mr. Gourlay, who is a vice president. And then below that, you had Mr. Smith who was, basically, a loan officer. There was a bank of ten people, the evidence showed. So it was a very small bank. It had a capitalization of only $8 million. So, in that regard, there weren't enough people to really spread the culpability around too much greater. But to be sure, we agree that Mr. Gourlay and Mr. Durham bear greater responsibility because their fiduciary duty to the bank

was greater, but Mr. Smith participated as well.

As a consequence of this -- and this -- again, this was not one mistake. This was not two mistakes. I mean we're talking about 17 different loans that were fraudulent and that were in violation of FDIC regulations. They were intentionally so because Mr. Vinson, in the eyes of Pisgah -- certainly, in the eyes of Pisgah Community Bank, was too big to fail. They had already loaned too much money to him. And if Seven Falls failed at this point, they were just bailing out the boat as best as they could.

I suggest that to say that I'm not excusing the behavior by any means. We agree that Mr. Gourlay did not profit financially from this fraud. We don't have evidence that he received kickbacks or anything like that unlike, for example, Mr. Dimitris. But what he did do is he lied. He lied repeatedly to the board to allow these loans to go through hoping that White Knight outside funding was going to come in and rescue the bank. Of course, it didn't. But even if it had, it still would have been a fraud and it still would have been false documents filed with the court and they knew that.

The defendant definitely should get the benefit of cooperating, and we believe that our 5(k) motion has done that, but the conduct at this bank is extensive. It's 17

different loans and over $9 million. It caused the collapse of the bank. It caused the FDIC to step in this year and has had to absorb those losses, and that's losses on the taxpayers. So we ask the Court to sentence to 37 months as an appropriate reflection of the nature of the conduct and rewarding him for his cooperation with the government. Thank you.

THE COURT: Thank you.

MR. FREEDMAN: Your Honor, if I may just address briefly or not.

THE COURT: You may.

MR. FREEDMAN: Just if -- and essentially, just to re-emphasize that, again, Mr. Gourlay was the one who came in. And if they didn't know certain things before Mr. Gourlay started to cooperate, I would contend that, at least in so no small part, they learned a lot of things and learned from the inside from Mr. Gourlay. I don't think it should be held against him to say we learned these things from working with Mr. Gourlay and Mr. Gourlay's guidelines should have been way up here, when all the argument was that his guidelines wouldn't have been affected once he comes in. That's sort of contrary to the sentencing guidelines and non-attribution agreements.

At the time we did the plea in front of Judge

Howell, essentially, Mr. Ellis indicated to Judge Howell that this was the loss amount that was being attributed to Mr. Gourlay because that's what was known at the time. So, to bring this in in these other amounts, Your Honor, is contrary to whole essence of coming in and working with the government and presenting them so they can bring in other wrongdoers, which is essentially what Mr. Gourlay has been doing.

In addition, Mr. Gast says that Mr. Smith and Mr. Gourlay were of relative culpability. Then, certainly, Mr. Gourlay should not receive a sentence greater than Mr. Smith. He, conceivably, should have received one less because he essentially assisted the government from the entire process. He came in at the beginning up to the point the Court saw him last month testify -- not just testify against Mr. Vinson but, essentially, was in the best position to bring in Mr. Durham, Mr. Cashion and Mr. Chapman.

He's done everything that was asked of him. And the point that we're asking for is other issues that comes into the 3553(a) factors when to consider what an appropriate sentence is. Thank you.

THE COURT: Thank you.

Mr. Gourlay, at this time you have the opportunity to address the Court and to tell me anything

that you feel I should know before I make my decision about your sentence. Take your time.

THE DEFENDANT: I just -- I'm sorry to my community, banking community, my family, and I'm going to accept your decision. That's it.

THE DEFENDANT: Thank you.

THE COURT: Thank you, Mr. Gourlay. Pursuant to the Sentencing Reform Act of 1984 and the case of *United States versus Booker*, it is the judgment of this court, having considered the factors noted in 18 U.S.C., Section 3553(a), that the defendant, Robert Craig Gourlay, is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 15 months.

Now, with regard to the application of the factors for sentencing under the statute, as I've said in the other two sentencings in this case earlier today, I find the application of these factors to be quite difficult because, on the one hand, I find the way that the application of the calculation of the offense levels and the guidelines to be of relatively little value because it largely lumps all the defendants together based on whatever loss amount they had some small involvement in. And I think that that is -- it is difficult to assess relative culpability by that method and, therefore, I

take that information to be, while advisory, a little bit advisory. In other words, it doesn't have a tremendous influence.

In light of the obvious shortcomings of that calculation, that leaves me with assessing the factors for sentencing under the statute Section 3553(a). And here, if I started with the factor of providing a just punishment to this defendant for this offense, I see that this defendant has already lost his career, his prestige, and he's lost his position in the community. He has -- he's humiliated himself with his actions in this matter. He has lost whatever wealth he has accumulated. He has lost an awful lot before any term of incarceration, much more than your average defendant I believe. Nonetheless, I have to look at this from the standpoint of having a sentence that reflects the seriousness of the offense, as well as to afford adequate deterrence to criminal conduct of this nature.

Here I see this defendant as having some substantial culpability. I believe that the evidence in this case was that one of the shareholders in this bank, a very influential shareholder of this bank, came in and, in essence, threw his weight around with the defendant and with the others there, including Mr. Smith. And even though this may have started with ideas about how to

make things work legitimately, as was discussed earlier today that the original proposal for some of these -- the first of these loans, the documents actually reflected that they were for short-term working capital for Seven Falls. But it became apparent that that was not going to be sufficient. And the defendant in this case, much like Mr. Smith, went along to get along.

The problem was that this defendant was the chief credit officer of the bank. He was one of the people who was charged with the responsibility of making sure this sort of thing didn't happen, and that's serious. And it is because of that that I see this as a case that does not call out for a probationary sentence, as has been advocated by defendant's counsel. In fact, it's a case that doesn't come anywhere near a probationary period. I see that -- I see this defendant's involvement as being somewhat less than Mr. Greenwood's, yet still warranting substantial punishment.

The reason that I have gone to a sentence of 15 months is largely in recognition of the degree of cooperation by this defendant. He cooperated from the beginning. He provided an awful lot of information that the government didn't know. I also recall in some detail the defendant's testimony at the Vinson trial. And I would venture to say that the government's conviction of

Mr. Vinson, or obtaining a conviction of Mr. Vinson, would have been quite a bit more problematic had it not been for the testimony of this defendant. The government had moved for a four level downward departure which, I think, is significant. It is rare that I see the government moving for four level downward departures. Assessing where this defendant stands within this case and then applying that four level departure for that degree of cooperation and assistance has been what has landed me at the 15-month sentence. I believe that this also avoids unwarranted disparities of sentencing among defendants as called for under the statute.

I will note that one of the factors for sentencing is to protect the public from further crimes of the defendant. I would venture to say, Mr. Gourlay, that I don't think that we will ever see you back here again, will we?

THE DEFENDANT: No, sir.

THE COURT: It is ordered that the defendant be required to support all dependents from prison earnings while incarcerated, as outlined in the presentence report.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of three years. This consists of a term of three years as to

Count One and three years as to Count Two, with those terms to run concurrently. I believe I neglected to state earlier that the term of incarceration was 15 months as to Count One and 15 months as to Count Two, with those to be concurrent.

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released. While on supervised release, the defendant shall not commit another federal, state or local crime and shall comply with the standard conditions that have been adopted by the Court in the Western District of North Carolina.

In addition, the defendant shall comply with the following additional condition. The periodic drug testing mandated by the Violent Crime Control And Law Enforcement Act of 1994 is hereby suspended. The Court finds that this offense is not drug-related and that the defendant has no current or past history of substance abuse.

With regard to the issue of restitution. The Court will hold open restitution for a period of 90 days, pursuant to 18 U.S.C., Section 3663A, and there will be a hearing regarding the issue of restitution in this matter. The Court gives notice that this case may

involve other defendants who may be liable and who may be held jointly and severally liable for the payment of all or part of the restitution ordered and the Court may order such payment in the future. It is further ordered that the victims' recovery is limited to the amount of their loss. The defendant's liability for restitution ceases if and when the victims receive full restitution.

It is further ordered that the defendant shall pay the United States a special assessment in the amount of $200.

The Court finds that the defendant does not have the ability to pay a fine or interest and, having considered the factors noted in 18 U.S.C., Section 3572(a), will waive the payment of fine and interest in this case. Payment of the criminal monetary penalties shall be due and payable immediately.

The Court has considered the financial and other information contained in the presentence report and finds that the following is feasible. If the defendant is unable to pay any monetary penalty immediately, during the period of imprisonment payments shall be made through the Federal Bureau of Prisons Inmate Financial Responsibility Program. Upon release from imprisonment, any remaining balance shall be paid in monthly installments of no less than $100 to commence within 60

days after release until paid in full.

Throughout the period of supervision the probation officer shall monitor the defendant's economic circumstances and shall report to the Court, with recommendations as warranted, any material changes that affect the defendant's ability to pay any court ordered penalty.

Mr. Freedman, are there any other issues regarding either the sentence or the judgment that need to be addressed?

MR. FREEDMAN: Your Honor, just two issues briefly. I explained to Mr. Gourlay the Bureau of Prisons decides where he would go. But, since his family is all in Asheville, if the Court could consider recommending a facility as close to Asheville, North Carolina as possible. And he's been out on pretrial release for the past three years, so we would ask that he be allowed to self-report.

THE COURT: Okay. With regard to the recommendation regarding location. Mr. Gourlay, as your attorney has explained to you, the Bureau of Prisons has the authority as to where to place you. I will include in the judgment a recommendation that you be placed as close as possible to Asheville, North Carolina considering your security classification. I believe the

Bureau of Prisons tries to make some effort to comply with that sort of recommendation.

With regard to the issue of self-surrender. Mr. Gast, what's the position of the government?

MR. GAST: No objection, Your Honor.

THE COURT: Okay. That will be allowed. Mr. Gourlay, what that means is that you will receive a notice as to when and where to appear to begin the service of this sentence. You will have the responsibility of transporting yourself to wherever that location may be in order to comply with that, rather than your being taken into custody today.

Anything else, Mr. Freedman?

MR. FREEDMAN: No, Your Honor.

THE COURT: Mr. Gast, anything else for the government?

MR. GAST: No, sir, Your Honor.

THE COURT: Mr. Gourlay, you have the right to appeal this sentence to the Fourth Circuit Court of Appeals on any grounds you've not previously waived. You have pleaded guilty pursuant to a plea agreement. In that plea agreement, there are significant waivers that may have a significant effect on your appeal rights. You will need to discuss with your attorney what effect those may have.

However, if you choose to appeal, you must file a written notice of appeal with the clerk of this court within a period of 14 calendar days following the date of the entry of the final judgment in this case. If you wish to appeal but do not have the funds with which to appeal, you may file an Affidavit of Indigency and, if approved by the Court, you may appeal at government expense. Do you understand this right of appeal as I have explained it to you?

THE DEFENDANT: Yes, Your Honor.

THE COURT: With that, that will conclude this matter. And I will say, Mr. Gourlay, that this case in many respects, obviously, is a sad one for you and your family, but it's also a sad one for a lot of people who lost a lot of money as a result of these activities. But, if there is some way to turn this to something positive -- as negative as it is right now, if there's some way that you can turn it to something positive in your life, I have every confidence that you're going to find a way to do it.

I've read all these letters. I know what all those people back there think about you and what they think about your character and your abilities, and they have a lot of confidence in you too. You sure got off the track here. They don't understand it and I don't

understand it and, for that matter, I don't think you understand it at this point why that could have happened. But, this one case does not dictate who you are. You have the opportunity to make sure that you're going in a very different direction now, as you have for so much of your life. Please, make sure that happens. We wish you the best in the that, Mr. Gourlay.

That concludes this matter. You will probably need to have a short discussion with the marshals, Mr. Gourlay, before you leave the building.

MR. FREEDMAN: Thank you, Your Honor. Thank you for allowing us to do this this afternoon.

THE COURT: Thank you.

(Off the record at 3:10 p.m.)

**CERTIFICATE**

I, Tracy Rae Dunlap, RMR, CRR, an Official Court Reporter for the United States District Court for the Western District of North Carolina, do hereby certify that I transcribed, by machine shorthand, the proceedings had in the case of UNITED STATES OF AMERICA versus ROBERT CRAIG GOURLAY, Criminal Action Number 1:11-CR-86 on November 26, 2013.

In witness whereof, I have hereto subscribed my name, this 23rd day of December 2013.

__/S/__Tracy Rae Dunlap__
TRACY RAE DUNLAP, RMR, CRR
OFFICIAL COURT REPORTER